**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LACHAE VICKERS, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HALFDAY TONICS INC.,<br><br>Defendant. | **CLASS ACTION COMPLAINT**<br>**DEMAND FOR JURY TRIAL**<br><br>Case No. 2:26-cv-935 |

Plaintiff Lachae Vickers, on behalf of herself and all others similarly situated, brings this class action suit for damages and equitable relief against Halfday Tonics Inc. ("Halfday" or Defendant"). Plaintiff alleges the following based upon personal information as to allegations regarding herself, and the investigation of her counsel, and on information and belief as to all other allegations:

## PRELIMINARY STATEMENT

1. Halfday Tonics Inc. ("Halfday" or "Defendant") sells cans of iced tea ("Tea" or "Product") on its website https://drinkhalfday.com/. Halfday claims that its Tea is a prebiotic, meaning it promotes the growth of beneficial microorganisms in the digestive track. As such, Halfday also claims that its Tea is "good for your gut." These claims are both false and misleading.

2. Prebiotics are ingredients in various high-fiber foods—such as bananas, asparagus, onion, and garlic—that consumers' bodies cannot fully digest. Because they are not digested, prebiotics feed bacteria in the gut, helping the bacteria to grow and create a healthy microbiome in the human stomach. Prebiotics are essential to maintaining good health, providing benefits such as a well-functioning immune system and a reduced risk of colorectal cancer.

3. Defendant claims that its Tea is a prebiotic and, separately, "good for your gut" because it includes a proprietary blend of three types of soluble fiber: cassava root fiber, fructan fiber, and agave inulin.

4. According to the Tea's nutrition label, it contains just six grams of this fiber blend. This means that one Tea contains, at most, six grams of dietary fiber.

5. Noticeably absent from Halfday's packaging, website, and promotional materials are any statements specifying how many cans of Tea consumers must drink to benefit their gut health. Without this specification—and with the words "prebiotic benefits" and "good for your gut" consistently used to describe the Tea—Defendant creates the expectation that just one Tea is good for a consumers' gut health. This is simply not true.

6. Study after study confirms that cassava root fiber, fructan fiber, and agave inulin only start to benefit consumers' health when ingested every day for multiple weeks.

7. More importantly, consumers need to ingest significantly more than six grams of these fibers to experience any noticeable effects.

8. This means that consumers would have to drink multiple cans of Tea every day for multiple weeks to reap any meaningful benefits to their gut health. But if consumers actually drank enough Tea to try to gain its prebiotic benefits and benefit their gut, the opposite would happen and the Tea could actually diminish consumers' health.

9. First, each Tea includes three to five grams of sugar. Drinking multiple cans a day could drastically increase consumers' daily sugar intake, and studies show that maintaining a high-sugar diet negatively alters consumers' microbiome. Excess sugar can even lead to metabolic disease, pre-diabetes, and weight gain. So, if consumers drank enough Tea to benefit from the prebiotic fiber, the increased sugar intake would counteract any benefits.

10. Second, drinking multiple Teas a day could also harm consumers' digestive system. Defendant's fiber blend is made up of only soluble fiber—as opposed to the mix of soluble and insoluble fiber found in fruits and vegetables. Consuming too much soluble fiber—especially in the absence of insoluble fiber—can lead to gas, bloating, constipation, and, in extreme cases, liver cancer.[1] None of these symptoms or effects are "good for your gut."

11. In short, Halfday's Tea cannot provide consumers with meaningful prebiotic benefits unless ingested every day, in unreasonable amounts. Even then, any resulting benefits would be counteracted by the amounts of sugar and soluble fiber included in the Tea.

12. Accordingly, Plaintiffs seek monetary and injunctive relief against Defendant for violating the New York General Business Law ("GBL") §§ 349–50, under other states' consumer protection laws, and for unjust enrichment.

**PARTIES**

13. Plaintiff Lachae Vickers is an individual who resides in Shirley, New York and

---

[1] https://www.health.com/how-to-boost-fiber-intake-without-bloating-11785723; https://pmc.ncbi.nlm.nih.gov/articles/PMC9268622/

purchased Halfday's Sweet Tea. Plaintiff bought the Tea after seeing claims advertising the Tea's health benefits, such as claims that the Tea was "good for your gut" and had "prebiotic benefits" on its packaging. Plaintiff reasonably relied on Halfday's false advertisements and misleading information and would not have purchased the Tea or would have paid less for it had she known about Halfday's deceptive practices.

14. Defendant Halfday Tonics Inc. is a Delaware corporation that is headquartered in Laurel Springs, New Jersey, and it is responsible for the false advertising and misleading statements that Plaintiff reasonably relied on when she purchased Halfday Tea.

**JURISDICTION**

15. This Court has jurisdiction over this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. § 1332(d)(2), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed classes is a citizen of a different state than Halfday.

16. This Court has personal jurisdiction over Halfday because it conducts substantial business in this District, and a substantial part of the acts and omissions complained of occurred in this District.

**VENUE**

17. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Halfday resides in this District and is subject to this Court's personal jurisdiction and under (b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

**FACTS**

**I. Overview of Halfday Tea**

18. Halfday Tea was founded in 2021.[2] Since then, the company has grown exponentially, raising millions of dollars in funding and selling its Tea in nationwide chains such

[2] https://www.linkedin.com/company/drinkhalfday/about/

as Whole Foods.

19. Halfday has made millions in revenue from its Tea.[3]

20. Halfday markets its Tea as a "good for your gut" drink that can provide consumers with "prebiotic benefits."

21. Prebiotics are ingredients in various high-fiber foods—such as bananas, asparagus, onion, and garlic—that consumers' bodies cannot fully digest. Instead, prebiotics serve as food for bacteria in the gut, helping the bacteria to grow and create a healthy microbiome in its host.[4] In other words, increased fiber intake can lead to a healthier gut microbiome and healthier digestion.

22. The idea for Halfday Tea was inspired by one of the founder's battles with ulcerative colitis—a condition linked to microbiome health.[5] After he recovered, he and his friend created Halfday Tea to help fill fiber gaps in consumers' diets, thus increasing the strength of their microbiomes.[6] The only problem is that Halfday's Tea does not support microbiome health as advertised.

23. Halfday claims that its Tea is "good for your gut" because it contains three types of prebiotic fibers: cassava root fiber, fructan fiber, and agave inulin.

24. Cassava fiber is a soluble fiber from the cassava, or Yuca, plant.[7]

25. Fructan fiber is an umbrella term used to describe soluble fiber that is "composed of fructosyl units and terminated by a single glucose molecule,"[8] and can be found in asparagus, leeks, and onions.[9] (Halfday does not specify which type of fructan fiber is used in the Tea.)

---

[3] https://leadiq.com/c/halfday-iced-tea/5e53fcb7626d3b6fe0193cee#:~:text=Growth%20Potential%20With%20revenues%20between,retail%20outlets%20to%20increase%20distribution.
[4] https://www.health.harvard.edu/nutrition/prebiotics-understanding-their-role-in-gut-health#:~:text=Prebiotics%20are%20ingredients%20in%20certain,work%20in%20tandem%20with%20probiotics.
[5] https://my.clevelandclinic.org/health/diseases/10351-ulcerative-colitis
[6] https://drinkhalfday.com/pages/faq. Good gut health has been linked to many health benefits, including a strong immune system and a reduced likelihood of developing colorectal cancer. *Id.*
[7] https://www.nutrafoodingredients.com/products/tapioca-cassava-fiber/
[8] https://pmc.ncbi.nlm.nih.gov/articles/PMC4417592/
[9] *Id.*

26. Agave inulin is a soluble dietary fiber that occurs naturally in the agave plant.

27. A Tea with prebiotic benefits may sound appealing, but it is not quite what it seems. Prebiotics can only benefit gut health when consumed daily, in relatively large amounts, and over long periods of time.

28. To see any meaningful benefit to their gut health, consumers would have to drink multiple cans of Tea, every day, for many weeks. At that point, any potential benefit to their gut health would be counteracted by the Tea's other ingredients, rendering those benefits illusory.

## II. Halfday's Gut-Healthy Claims

29. A primary selling point of Halfday's Tea is that it includes "6g gut-healthy plant fiber" that provide "prebiotic benefits." These claims are prominently displayed on the Tea's packaging, Halfday's website, and on third-party product pages. As shown below, Halfday's claims that its Teas are "good for your gut" or "gut friendly" are ubiquitous.

30. First, Halfday Tea's packaging spotlights the beverage's "prebiotic benefits."

31. The front of the can claims that the Tea is "good for your gut." The back of the can claims that the Tea has "prebiotic benefits" because it contains "6g gut-healthy plant fiber."







32. Placing these gut-health-related claims directly on the packaging makes them impossible to miss.

33. But, even if customers buy the Tea online, Halfday still ensures they see these claims. Halfday's website is littered with language such as "gut-healthy," "good for your gut" and "gut-friendly."

34. Halfday's home page alone mentions the Tea's gut benefits multiple times. The first graphic consumers see describes the Tea as "gut-friendly" and "good for your gut":




35. One only has to scroll halfway down the page to find the "good for your gut" claim repeated:



36. Halfday even describes its purpose as "to make gut-friendly iced teas":




37. The rest of its website makes similar "gut-healthy" claims.

38. As shown below, Halfday employs some iteration of the phrase "gut healthy" to describe each type of fiber in the Tea. The cassava root fiber is "gut-friendly goodness from a nutrient-rich root"; fructan fiber is "a prebiotic boost to fuel your gut health"; and agave inulin is "a naturally sweet fiber that's good for your gut":



39. Lastly, Halfday asserts that its Tea can "top up the fiber your already getting from your food" and "keep your gut feeling great":




40. The assertion that the Tea is "good for your gut" is a primary selling point of the Tea.

41. Halfday's website informs consumers about the Tea, but it is not possible to purchase the Tea from the website. Instead, Defendant directs consumers to Amazon, where the idea of a "gut healthy" Tea is aggressively repeated.

[Space Left Intentionally Blank]

42. The product's heading blatantly states that the Tea "Supports Digestive & Gut Health":




43. And the "About this item" section also repeats "gut-healthy" claims.

44. This section generally describes all of Halfday's Teas, saying they are "gut-friendly iced teas" and that they "support your digestive wellness" because they include prebiotics, which

Halfday characterizes as "just the stuff your microbiome needs to thrive":




45. The photos on the Teas' Amazon pages also tout the Tea's "Prebiotic Benefits":






46. Nowhere does Halfday specify how many cans consumers should drink to reap these supposed benefits. Instead, Halfday's message is clear: drink this can of Tea and your gut microbiome will benefit.

47. Despite repeated assertions of being "gut-friendly," "good for your gut," or having "prebiotic benefits," Halfday's Tea is unlikely to have any material impact on consumers' gut health.

48. Each can of Tea contains only six grams of dietary fibers but three to five grams of added sugar. Consumers would have to drink multiple cans of Tea, every day, for weeks before the fibers in each can—individually or as a group—had any effect on their gut health. By that point, any digestive benefits would be counteracted by the amount of added sugar consumers would be ingesting each day. Consuming so much soluble fiber could also have deleterious effects.

## III. Agave Inulin

49. Inulin can provide positive benefits, especially for gut health, but only if consumers ingest a certain amount of it every day for multiple weeks.

50. A key benefit of inulin is that, when fermented by gut bacteria, it causes the body to produce short-chain fatty acids (SCFAs)—organisms in the gut that provide many health benefits, including maintaining immune homeostasis, glucose homeostasis, and intestinal barrier integrity.[10]

51. A recent study shows, however, that SCFAs levels are not changed by small amounts of agave inulin. Participants in this experiment were given doses of 5 grams and 7.5 grams of agave inulin every day for 3 weeks.

52. The study concluded that agave inulin alone did not create a scientifically significant positive change in participant's short-chain fatty acids.[11] At such low levels, agave inulin cannot provide the key benefits associated with prebiotic intake.

---

[10] https://www.sciencedirect.com/science/article/pii/S0144861716303812; https://www.mdpi.com/2072-6643/14/13/2559

[11] https://www.sciencedirect.com/science/article/pii/S0022316622088551#bib48

53. If 7.5 grams of agave inulin cannot improve gut health, then Defendant's Tea, which contains even less, certainly cannot.

54. Each can of Tea contains 6 grams of a blend of cassava root fiber, fructan fiber, and agave inulin. Even if this blend were entirely made of agave inulin, that would still be less than the 7.5 grams of agave inulin tested in the study.

55. Since each can of Tea necessarily has less than 6 grams of inulin, and likely a lot less, consumers would have to drink multiple cans a day to match the participants in this study. And even then, as the study concluded, they would not see any scientifically significant positive change in their short-chain fatty acids.

56. Another study found that inulin can impact the presence of very low-density lipoproteins (VLDLs). High levels of VLDLs can lead to a buildup of plaque on the walls of arteries, ultimately contributing to cardiovascular disease.[12] That study concluded that consuming inulin can lower VLDL levels but only by ingesting 12 grams of inulin every day for a month.[13]

57. These findings indicate that minimal consumption of agave inulin fiber will not provide real benefits, like Halfday claims. They also confirm what health professionals already know. To quote Dr. Holscher, professor of nutrition at University of Illinois Urbana-Champaign, "'if people are concerned about their microbiome, they need to eat vegetables.'"[14] They cannot get the same effects simply by drinking Halfday's Tea.

58. Ultimately, a drink that contains a prebiotic supplement—like Defendant's Tea—is ineffective, and the claim that it can provide "gut-healthy" benefits is misleading. There is no substitute for eating high-fiber foods, notes Cedars-Sinai, a hospital in Los Angeles, California,

---

[12] https://www.mayoclinic.org/diseases-conditions/high-blood-cholesterol/expert-answers/vldl-cholesterol/faq-20058275#:~:text=Very%2Dlow%2Ddensity%20lipoprotein%2C,type%20of%20fat%20called%20triglycerides.
[13] https://pmc.ncbi.nlm.nih.gov/articles/PMC5622781/
[14] https://fshn.illinois.edu/news/are-prebiotic-sodas-good-gut-health

> [a] diverse diet is the best way to consume prebiotics and support the growth of healthy bacteria. That means following established nutritional guidelines, avoiding ultra-processed food and artificial additives, and eating a variety of plants, including vegetables and grains like quinoa and rice.[15]

## IV. Fructan Fiber

59. Similar to agave inulin, fructan fiber has little impact on the production of SCFAs even if ingested at a rate of sixteen grams per day for three weeks.

60. A study published in the British Journal of Nutrition tested whether the gut microbiomes of people with consistently low dietary fiber intake reacted differently to fructan fiber than those with consistently high dietary fiber intake. Participants were given sixteen grams of powdered fructan prebiotic every day for three weeks. The study found that "in the whole cohort, there were no significant changes in SCFA concentrations owing to the prebiotic intervention."[16]

61. If taking sixteen grams of fructan every day for three weeks cannot improve gut health, it is unreasonable to claim that one, or even several, of Defendant's Teas will have this effect.

62. This same study also discovered that the group with consistently low-fiber intake "appeared to harbour a gut microbiota community that was more resilient to change and, therefore, less responsive to the [fructan]" compared to those with high-fiber diets.

63. In other words, if a consumer has a consistently low-fiber diet, prebiotic intervention struggles make up for it—especially if provided in minimal amounts, as is the case with Defendant's Tea. This finding runs counter to Halfday's claim that its Tea can fill gaps for those who do not eat enough fiber, which are prevalent throughout Halfday's advertising.

---

[15] https://www.cedars-sinai.org/blog/should-you-take-probiotics-and-prebiotics.html

[16] https://www.cambridge.org/core/journals/british-journal-of-nutrition/article/habitual-dietary-fibre-intake-influences-gut-microbiota-response-to-an-inulintype-fructan-prebiotic-a-randomised-doubleblind-placebocontrolled-crossover-human-intervention-study/637C3E930108F079BD8DB4049562449C

64. The study concluded that "it is difficult to predict how the gut microbiota will respond to a dietary intervention."[17] Again, this casts doubts on Halfday's gut-health claims.

65. Additional studies corroborate the conclusions of the study above. They have shown that any benefits derived from ingesting fructan only accrue after ingesting significant amounts over a prolonged period of time.

66. Research conducted at the University of Minnesota, for instance, found that ingesting 8 grams of fructans *every day for one year* might lead to better calcium absorption.[18] In other words, prebiotics are beneficial, but their benefits are not instantaneous.

67. As with agave inulin, these findings indicate that minimal consumption of fructans will not provide real benefits, contrary to Halfday claims.

**V. Cassava Root**

68. Cassava is what is known as a tuber vegetable, a name used to describe vegetables that grow underground.[19] The scientific evidence behind the health benefits of cassava root fiber is no different than the evidence for agave inulin and fructan, discussed above.

69. Research conducted in 2025 by the College of Biological Science and Food Engineering in China studied the impact of cassava on obesity and gut health.

70. The study took four groups of mice and fed each of them a different diet. One group of mice was fed a diet composed of ten percent cassava fiber. The study found that "cassava fiber *may* alter [bacteria] abundance in the intestine, affecting gut barrier integrity and host metabolic processes, resulting in an anti-obesogenic effect" (emphasis added).[20]

---

[17] *Id.*
[18] https://www.mdpi.com/2072-6643/5/4/1417The
[19] https://www.freshpoint.com/news/root-vegetables-vs-tubers/
[20] https://www.mdpi.com/2304-8158/14/23/4121#Abstract

71. In other words, cassava fiber, when consumed in high quantities on a daily basis for a period of sixteen weeks, can benefit gut health. Drinking one, or even several, of Defendant's Teas does not mimic these conditions.

72. A similar study tested the impact of cassava flour on gut health and digestion. For seven weeks, rats were fed various diets, including a dietary mix that contained about 496 g/kg of cassava flour.[21] By the end of the experiment, the rats consumed nearly 584 grams of cassava flour over seven weeks or *fifty percent* of their overall diet.

73. The study determined that "*long-term* administration of tuber flours would have… health promoting effects on body weight, gut permeability and related metabolic diseases" (emphasis added).[22]

74. Both studies show that cassava fiber may improve gut health if it is ingested daily, as a significant part of one's *overall* diet, over many weeks. Drinking one, or even several, of Defendant's Teas cannot meet those requirements.

## VI. Halfday's Tea Cannot Provide Prebiotic Benefits

75. Halfday contends that its Tea has "6g gut-healthy plant fiber" that make the Tea "good for your gut." At most, each can of Tea contains six grams of total dietary fiber and must contain less than six grams of each kind of fiber.

76. As shown above, agave inulin, fructans, and cassava fiber can improve gut health when they are ingested in significant quantities—well over six grams—on a daily basis for weeks on end. There is no evidence that sporadic consumption of these fibers, or regular consumption of these fibers at lower quantities, has any noticeable benefit on gut health or otherwise.

77. Take agave inulin for example. Studies found that inulin only benefitted consumers' health if they ingested twelve grams each day for one month. With necessarily less

---

[21] https://pmc.ncbi.nlm.nih.gov/articles/instance/8571703/bin/mmc1.pdf
[22] https://pmc.ncbi.nlm.nih.gov/articles/PMC8571703/#s0010

than six grams of agave inulin per can, consumers would have to drink *multiple cans* of Tea *every day* for a full month before they noticed any effect on their gut health from agave inulin.

78. By that point, however, consumers would have ingested a significant amount of added sugar. Consuming sugar at this rate would not only counteract the potential prebiotic benefits of the Tea, but it would actually be detrimental to consumers' health.

79. Many studies have examined the negative effects of sugar on microbiome and gut health. One recent study found that "[h]igh sugar intake seems to stagger the balance of microbiota," leading to "increased pro-inflammatory properties, decreased immune-regulatory functions and decreased capacity to regulate epithelial [body tissue] integrity."[23]

80. Another study conducted at Columbia University found that "sugar alters the gut microbiome, setting off a chain of events that leads to metabolic disease, pre-diabetes, and weight gain."[24]

81. In other words, drinking enough Tea to gain its prebiotic benefits means ingesting enough sugar to negate those same benefits.

82. Moreover, drinking any quantity of Defendant's Tea cannot counteract the negative effects of the high sugar diets maintained by average Americans.

83. The Center for Disease Control (CDC) suggests that people over the age of two consume no more than 48 grams of sugar per day.[25] Americans routinely exceed this recommendation, often consuming 68 grams of sugar per day, or more.[26]

84. As noted above, each can of Tea contains three to five grams of added sugar. For every Tea a consumer drinks they add more sugar to their diet.

85. So, regardless of the makeup of the fiber blend, Defendant's Tea does not provide

---

[23] https://pmc.ncbi.nlm.nih.gov/articles/PMC7284805/#B19-nutrients-12-01348 ; *See also* https://www.cghjournal.org/article/S1542-3565(21)01305-7/fulltext

[24] https://www.cuimc.columbia.edu/news/sugar-disrupts-microbiome-eliminates-protection-against-obesity-and-diabetes

[25] https://www.cdc.gov/nutrition/php/data-research/added-sugars.html

[26] https://pmc.ncbi.nlm.nih.gov/articles/PMC9863459/

enough fiber to benefit gut health or to counteract the high sugar diets that many Americans already maintain.

86. Additionally, because Defendant's Tea only contains soluble fiber, drinking multiple cans every day for a month could seriously harm consumers' digestive health.

87. There are two different kinds of dietary fiber: soluble and insoluble.

88. Defendant's Teas only contain soluble fiber, which helps to slow digestion, decrease cholesterol, and lower blood sugar. Insoluble fiber "help[s] food and waste pass through the gut more easily,"[27] and without it, "the bowel does not get enough exercise, leading to fewer bowel movements and eventual constipation."[28] It also helps to increase the bulk of stool.[29]

89. Medical consensus stresses the importance of consuming a wide variety of fruits, vegetables, and grains to obtain both kinds of fiber and their complementary benefits.[30]

90. Medical professionals also stress that ingesting too much of one kind of fiber can be harmful. For example, soluble fiber—the only type of fiber in the Tea—can cause gas and discomfort if taken in excess.[31] Recent studies have even linked surpluses of soluble fiber to liver cancer.[32]

91. Although it is recommended that adults consume 25 to 30 grams of fiber per day, only 6 to 8 grams of that should be coming from soluble fiber.[33] As noted above, consumers would have to drink *multiple* cans of Tea *every day* for a full month before they noticed any effect on

---

[27] https://www.nih.gov/news-events/nih-research-matters/health-benefits-dietary-fibers-vary
[28] https://bastyr.edu/about/news/do-we-really-need-insoluble-fiber
[29] https://www.mayoclinic.org/healthy-lifestyle/nutrition-and-healthy-eating/in-depth/fiber/art-20043983#:~:text=Soluble%20fiber%20is%20found%20in,and%20adds%20bulk%20to%20stool.
[30] https://www.healthline.com/health/soluble-vs-insoluble-fiber#sources-of-fiber
[31] *Id.*
[32] https://pmc.ncbi.nlm.nih.gov/articles/PMC9268622/
[33] https://www.ucsfhealth.org/education/increasing-fiber-intake#:~:text=The%20best%20sources%20of%20soluble,day%20%E2%80%94%20coming%20from%20soluble%20fiber.

their gut health. By that point, these beneficial effects would likely be obscured by the effects of consuming excess soluble fiber—namely gas, bloating and constipation.

### VII. Halfday's Deception Was Intentional

92. Notably absent from Halfday's marketing is any mention of how frequently consumers should drink its Tea. Rather, Halfday recites, over and over, that the Tea is "good for your gut" on its packaging, website, and product pages. The implicit messaging is clear: drink this Tea and your gut health will benefit. As noted above, that message is misleading.

93. Most consumers do not have an advanced understanding gut-health, making it unlikely that they would be able to discern an effective amount of prebiotics from an ineffective amount. Moreover, many would not understand the potential risks associated with ingesting excess soluble fiber, nor would they anticipate how the sugar in each Tea interacts with the microbiome, upsetting the delicate balance of bacteria in the gut and negating any benefit gained by the Tea's fiber blend.

94. Plaintiffs and Class Members reasonably relied on Halfday's "good for your gut" and prebiotic representations and were harmed as a result.

## CLASS ACTION ALLEGATIONS

95. Plaintiff brings this action on behalf of herself and on behalf of the following proposed Nationwide Class, initially defined as follows:

> All persons in the United States who purchased the Tea within the relevant limitations period, and/or such subclasses as the Court may deem appropriate.

96. Plaintiff also brings this action on behalf of herself and on behalf of the following proposed New York Class, initially defined as follows:

> All persons in New York who purchased the Tea within the relevant limitations period, and/or such subclasses as the Court may deem appropriate.

97. Excluded from the proposed Classes are Halfday, its, parents, subsidiaries, affiliates, officers, and directors, and any entity in which Halfday has a controlling interest.

98. Plaintiff reserves the right to re-define any of the class definitions prior to class certification and after having the opportunity to conduct discovery.

99. The claims of all class members derive directly from a single course of conduct by Halfday. Halfday has engaged and continues to engage in uniform and standardized conduct toward the putative class members. Halfday does not differentiate, in degree of care or candor, in its actions or inactions, or the content of its statements or omissions, among individual class members.

100. Certification of Plaintiff's claims is appropriate because Plaintiff can prove the elements of Plaintiff's claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

101. Accordingly, Plaintiff brings this lawsuit as a class action on Plaintiff's own behalf and on behalf of all other business, entities, and individuals similarly situated pursuant under Rule 23 of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

102. Specifically, this action has been properly brought and may properly be maintained as a class action under Rule 23(a)(1-4), Rule 23(b)(1), (2), or (3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure.

103. **Numerosity** (Fed. R. Civ. P. 23(a)(1)). The members of the proposed Classes are each so numerous that their individual joinder would be impracticable. While the exact number is not known at this time, it is generally ascertainable by appropriate discovery, and it is believed each Class includes many tens of thousands of members. The precise number of class members, and their addresses, are unknown to Plaintiff at this time but can be ascertained from Halfday's records.

104. **Ascertainability.** The Classes are ascertainable because their members can be readily identified using business records, and other information kept by Halfday in the usual course of business and within their control or Plaintiff and the Classes themselves. Plaintiff anticipates providing appropriate notice to the Classes to be approved by the Court after class certification, or pursuant to court order.

105. **Commonality and Predominance** (Fed. R. Civ. P. 23(a)(2); 23(b)(3)). Common questions of law and fact exist as to all class members. These questions predominate over the questions affecting only individual class members. The common legal and factual questions include, without limitation:

(a) Whether Halfday engaged in the conduct alleged in this Complaint;

(b) Whether Halfday violated the applicable statutes alleged herein;

(c) Whether Plaintiff and the class members are injured and harmed directly by Halfday's conduct;

(d) Whether Plaintiff and the class members are entitled to damages due to Halfday's conduct as alleged in this Complaint, and if so, in what amounts; and

(e) Whether Plaintiff and the class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief as requested in this Complaint

(f) Whether Plaintiff and the Classes are entitled to actual, compensatory, nominal, statutory, enhanced, and/or punitive damages;

(g) Whether Plaintiff and the Classes are entitled to injunctive, declaratory relief, or other equitable relief;

(h) Whether Plaintiff and the Classes are entitled to civil penalties;

(i) Whether Plaintiff and the Classes are entitled to reasonable attorneys' fees and costs.

106. **Typicality of Claims (Fed. R. Civ. P. 23(a)(3)).** The claims of Plaintiff and the putative class members are based on the same legal theories and arise from the same unlawful and willful conduct of Halfday, resulting in the same injury to Plaintiff and the putative class members. Plaintiff and all class members are similarly affected by Halfday's wrongful conduct, were damaged in the same way, and seek the same relief. Plaintiff's interests coincide with, and are not antagonistic to, those of the other class members. Plaintiff has been damaged by the same wrongdoing set forth in this Complaint.

107. **Adequacy of Representation (Fed. R. Civ. P. 23(a)(4)).** Plaintiff is an adequate representative of the Classes because her interests do not conflict with the interests of the class members, and he has retained counsel competent and experienced in complex class action, business competition, health care and consumer litigation. Plaintiff and her counsel will fairly and adequately protect the interest of the class members.

108. **Superiority of a Class Action (Fed. R. Civ. P. 23(b)(3)).** A class action is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and class members. There is no special interest in class members individually controlling the prosecution of separate actions. The damages suffered by individual class members, while significant, are small given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Halfday's conduct. Further, it would be virtually impossible for the class members individually to redress effectively the wrongs done to them. And, even if class members themselves could afford such individual litigation; the court system could not, given the tens or even hundreds of thousands of cases that would need to be filed. Individualized litigation would

also present a potential for inconsistent or contradictory judgments. Individualized litigation would increase the delay and expense to all parties and the court system, given the complex legal and factual issues involved. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

109. **Risk of Inconsistent or Dispositive Adjudications and the Appropriateness of Final Injunctive or Declaratory Relief (Fed. R. Civ. P. 23(b)(1) and (2)).** In the alternative, this action may properly be maintained as a class action, because:

(a) the prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudication with respect to individual class members, which would establish incompatible standards of conduct for Halfday; or

(b) the prosecution of separate actions by individual class members would create a risk of adjudications with respect to individual class members which would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

(c) Halfday has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Classes as a whole.

## FIRST CAUSE OF ACTION

### Violations of New York Gen. Bus. Law § 349
### (On Behalf of Plaintiff and the New York Class)

110. Plaintiff Vickers incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

111. NY GBL § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

112. NY GBL § 349 applies to Plaintiff and the New York Class because the State of New York has a strong interest in protecting its residents from false advertising and deceptive business practices by companies marketing consumer goods within the state.

113. Any person who has been injured by reason of any violation of NY GBL § 349 may bring an action in his or her own name to enjoin such unlawful acts or practices, an action to recover their actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not exceeding three times the actual damages, in addition to one thousand dollars per violation, if the court finds that the Halfday willfully or knowingly violated this section. The court may award reasonable attorneys' fees to a prevailing plaintiff.

114. As alleged herein, Halfday's advertisements and promotion of the Tea are materially misleading and deceptive within the meaning of NY GBL § 349.

115. Halfday's acts and practices deceived Plaintiff and the New York Class. Plaintiff and the New York Class reasonably relied on these representations and believed they were purchasing a product that would make a meaningful and significant difference in their gut health after only one use. In truth, the Tea cannot provide the advertised benefits.

116. Plaintiff Vickers and the New York Class did not receive the benefit of their bargain. They paid a price premium for products falsely marketed as being "good for your gut" and having "prebiotic benefits." The Tea is not capable of delivering on the promises Halfday makes.

117. Halfday disseminated these false and misleading statements throughout New York, which were known, or should have been known through reasonable care, to be untrue and misleading to consumers, including Plaintiff Vickers and the New York Class.

118. Plaintiff Vickers and the New York Class have been injured by Halfday's deceptive acts or practice, suffering an ascertainable loss by paying more for a product than they otherwise would have but for the false advertising.

119. Plaintiff Vickers and the New York Class have no adequate remedy at law.

120. Halfday's conduct has caused and continues to cause immediate and irreparable injury to Plaintiff Vickers and the New York Class and will continue to mislead consumers unless enjoined by this Court.

## SECOND CAUSE OF ACTION

### Violations of New York Gen. Bus. Law § 350
### (On Behalf of Plaintiff Vickers and the New York Class)

121. Plaintiff Vickers incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

122. By reason of the acts set forth above, Halfday has been and is engaged in consumer-oriented advertising and marketing against Plaintiff Vickers and class members located in New York, engaging in business conduct that is false and misleading in material respects, in violation of NY GBL § 350, which provides, in part, that "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

123. Halfday caused statements that were untrue or misleading, and which they knew to be untrue or misleading, to be disseminated throughout New York State and elsewhere, through advertising, marketing, and other publications.

124. Halfday's misrepresentations were material and substantially uniform in content, presentation, and impact upon consumers at large. Consumers were and continue to be exposed to Halfday's material misrepresentations.

125. Plaintiff Vickers and the New York Class have been injured by Halfday's deceptive acts or practices.

126. Plaintiff Vickers and the New York Class have no adequate remedy at law.

127. Halfday's conduct has caused and is causing immediate and irreparable injury to Plaintiff Vickers and the New York Class and will continue to damage both Plaintiff Vickers and the New York Class and deceive the public unless enjoined by this Court.

128. Pursuant to NY GBL § 350-e, Plaintiff Vickers and the New York Class seek monetary damages (including actual damages or $500, whichever is greater, and minimum, punitive, or treble and/or statutory damages pursuant to NY GBL § 350 a(1)), injunctive relief, restitution, and disgorgement of all monies obtained by means of Halfday's unlawful conduct, interest, and attorneys' fees and costs.

129. Halfday's conduct has also substantially injured the public, as consumers across New York were exposed to and relied upon Halfday's false advertising in deciding to purchase the Tea. Plaintiff and the New York Class reasonably relied on these representations and believed they were purchasing a product that would make a meaningful and significant difference in their gut health with only one use. In truth, the Tea cannot provide the advertised benefits.

130. Plaintiff Vickers and the New York Class did not receive the benefit of their bargain. They paid a price premium for products falsely marketed as being "good for your gut" and having "prebiotic benefits." The Tea is not capable of delivering on the promises Halfday makes.

131. The widespread deception not only caused financial harm to consumers but also promoted misleading narratives about the Tea's ability to replace whole-food diets that are rich in both soluble and insoluble fiber.

132. Halfday's conduct thus caused real-world harm and poses an ongoing risk of further injury if not enjoined.

**THIRD CAUSE OF ACTION**

**Violations of the Consumer Protection Laws of 49 States and the District of Columbia (On Behalf of the Nationwide Class)**

133. Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

134. Plaintiff brings this claim on behalf of the Nationwide Class for violations of the consumer protection acts of each of the States of the United States, and the District of Columbia, other than New York.

135. Plaintiff brings these statutory claims pursuant to the "Consumer Protection Laws" identified below, all of which were enacted and designed to protect consumers against unlawful, fraudulent, deceptive, and/or unfair business acts or practices and each of which are similar to the New York GBL §§ 349 & 350.

136. The following consumer protection statutes are collectively referred to herein as the "Consumer Protection Laws":

a. ALA. CODE § 8-19-1 et seq. (Alabama);

b. ALASKA STAT. ANN. § 45.50.471 et seq. (Alaska);

c. ARIZ. REV REV. STAT. ANN. § 44-1521 et seq. (Arizona);

d. ARK. CODE ANN. § 4-88-101 et seq. (Arkansas);

e. CAL. BUS. & PROF. CODE §§ 17200 et seq., CAL. BUS. & PROF. CODE §§ 17500 et seq., and CAL. CIV. CODE §§ 1750 et seq. (California);

f. COLO. REV. STAT. ANN. § 6-1-101 et seq. (Colorado);

g. CONN. GEN. STAT. ANN. § 42-110a et seq. (Connecticut);

h. DEL. CODE ANN. tit. 6, § 2511 et seq. (Delaware);

i. D.C. CODE ANN. § 28-3901 et seq. (District of Columbia);

j. FLA. STAT. ANN. § 501.201 et seq. (Florida);

k. GA. CODE ANN. § 10-1-370 et seq. (Georgia) and GA. CODE ANN. § 10-1-390 et seq. (Georgia);

l. HAW. REV. STAT. ANN. § 480-1 et seq. and HAW. REV. STAT. ANN. § 481A-1 et seq. (Hawaii);

m. IDAHO CODE ANN. § 48-601 et seq. (Idaho);

n. 815 ILCS 505/1 et seq. (Illinois);

o. IND. CODE ANN. § 24-5-0.5-0.1 et seq. (Indiana);

p. IOWA CODE § 714.16 et seq.

q. KAN. STAT. ANN. § 50-623 et seq. (Kansas);

r. KY. REV. STAT. ANN. § 367.110 et seq. (Kentucky);

s. LA. STAT. ANN. § 51:1401 et seq. (Louisiana);

t. ME. REV. STAT. tit. 5, § 205-A et seq. (Maine);

u. MD. CODE ANN., COM. LAW § 13-101 et seq. (Mary-land);

v. MASS. GEN. LAWS ANN. ch. 93A, § 1 et seq. (Massachusetts);

w. MICH. COMP. LAWS ANN. § 445.901 et seq. (Michigan);

x. MINN. STAT. ANN. § 325F.68 et seq., MINN. STAT. ANN. §325D.09 et seq., MINN. STAT. ANN. § 325D.43 et seq., and MINN. STAT. ANN. § 325F.67 (Minnesota);

y. MISS. CODE ANN. § 75-24-1 et seq. (Mississippi);

z. MO. ANN. STAT. § 407.010 et seq. (Missouri);

aa. MONT. CODE ANN. § 30-14-101 et seq. (Montana);

bb. NEB. REV. STAT. ANN. § 59-1601 et seq. (Nebraska);

cc. NEV. REV. STAT. ANN. § 41.600 and NEV. REV. STAT. ANN. §598.0903 et seq. (Nevada);

dd. N.H. REV. STAT. ANN. § 358-A:1 et seq. (New Hampshire);

ee. N.J. STAT. ANN. § 56:8-1 et seq. (New Jersey);

ff. N.M. STAT. ANN. § 57-12-1 et seq. (New Mexico);

gg. N.C. GEN. STAT. ANN. § 75-1 et seq. (North Carolina);

hh. N.D. CENT. CODE ANN. § 51-15-01 et seq. (North Dakota);

ii. OHIO REV. CODE ANN. § 1345.01 et seq. (Ohio);

jj. OKLA. STAT. ANN. tit. 15, § 751 et seq. (Oklahoma);

kk. OR. REV. STAT. ANN. § 646.605 et seq. (Oregon);

ll. 73 PA. STAT. ANN. § 201-1 et seq. (Pennsylvania);

mm. 6 R.I. GEN. LAWS ANN. § 6-13.1-1 et seq. (Rhode Island);

nn. S.C. CODE ANN. § 39-5-10 et seq. (South Carolina);

oo. S.D. CODIFIED LAWS § 37-24-1 et seq. (South Dakota);

pp. TENN. CODE ANN. § 47-18-101 et seq. (Tennessee);

qq. TEX. BUS. & COM. CODE ANN. § 17.41 et seq. (Texas);

rr. UTAH CODE ANN. § 13-11-1 et seq. (Utah);

ss. VT. STAT. ANN. tit. 9, § 2451 et seq. (Vermont);

tt. VA. CODE ANN. § 59.1-196 et seq. (Virginia);

uu. WASH. REV. CODE ANN. § 19.86.010 et seq. (Washington);

vv. W.VA. CODE ANN. § 46A-6-101 et seq. (West Virginia);

ww. WIS. STAT. ANN. § 100.20 (Wisconsin); and

xx. WYO. STAT. ANN. § 40-12-101 et seq. (Wyoming).

137. Plaintiff and members of the Nationwide Class have standing to assert claims under the Consumer Protection Laws because they are consumers within the meaning of the Consumer Protection Laws and Halfday's practices were addressed to the market generally and to each state's domestic market and otherwise implicate consumer protection concerns.

138. Halfday has engaged in and continues to engage in unfair, unlawful, deceptive and fraudulent trade practices as outline in this Complaint.

139. Halfday intended for Plaintiff and members of the Nationwide Class to rely on their unlawful, fraudulent, deceptive and/or unfair business acts and practices.

140. Plaintiff and those similarly situated relied, to their detriment, on Halfday's unlawful, fraudulent, deceptive and/or unfair business acts and practices. Had they been adequately informed and not deceived by Halfday, they would have acted differently by not purchasing the Tea or by paying less for it.

141. Halfday's acts and omissions are likely to similarly deceive the general public.

142. Halfday acts and omissions, where were knowing, willful, and wanton, constitute intentional violations of the Consumer Protection Laws.

143. Halfday engaged in these acts and omissions to increase their profits.

144. Accordingly, Halfday engaged in unlawful, fraudulent, deceptive and/or unfair practices within the meaning of each of the Consumer Protection Laws.

145. These practices also constitute unlawful competition and provide an unlawful advantage over Halfday's competitors as well as injury to the general public.

146. Plaintiff seeks, on behalf of the Nationwide Class, actual, compensatory and punitive damages, as available under each respective statute, to restore any and all monies acquired by Halfday from the Nationwide Class through unlawful, fraudulent, deceptive and/or unfair means, plus interest thereon. Plaintiff also seeks to recover attorneys' fees, costs and expenses to be asserted against Halfday, within the limits of applicable law.

147. Plaintiff also seeks, on behalf of the Nationwide Class, an injunction to prohibit Halfday from continuing to engage in the aforementioned acts and omissions.

148. Plaintiff also seeks, on behalf of the Nationwide Class, a declaration that Halfday's acts and omissions are unlawful, fraudulent, deceptive and/or unfair within the meaning of the Consumer Protection Laws.

149. As a direct and proximate result of Halfday's acts and omissions, Plaintiff and the Nationwide Class have suffered and continue to suffer injury in fact and have lost money or property as a result.

150. As a direct and proximate result of Halfday's acts and omissions, the company has enjoyed, and continues to enjoy, significant financial gain in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### Unjust Enrichment
### (On Behalf of Plaintiff and All Classes)

151. Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

152. Plaintiff and the Classes conferred a benefit on Halfday in the form of payments for the Tea.

153. Halfday accepted and retained these payments, even though it misrepresented the efficacy of the Tea.

154. It would be unfair for Halfday to keep the money spent without compensating Plaintiff and the Classes because Halfday misled consumers into believing the Tea weas effective, when in fact it is not.

155. Halfday's conduct has therefore caused and is causing immediate and irreparable injury to Plaintiff and the class members and will continue to both damage Plaintiff and the class members and deceive the public unless enjoined by this Court.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and the proposed Classes, pray for relief and judgment against Halfday as follows:

A. certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as representatives of the Classes, and designating Plaintiff's counsel as Class Counsel;

B. awarding Plaintiff and the Classes compensatory damages and actual damages, trebled, in an amount exceeding $5,000,000, to be determined by proof;

C. awarding Plaintiff and the Classes appropriate relief, including actual and statutory damages;

D. awarding Plaintiff and the Classes exemplary and punitive damages;

E. awarding Plaintiff and the Classes civil penalties;

F. granting Plaintiff and the Classes declaratory and equitable relief, including restitution and disgorgement;

G. enjoining Halfday from continuing to engage in the wrongful acts and practices alleged herein;

H. awarding Plaintiff and the Classes the costs of prosecuting this action, including expert witness fees;

I. awarding Plaintiff and the Classes reasonable attorneys' fees and costs as allowable by law;

J. awarding pre-judgment and post-judgment interest; and

K. granting any other relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: February 17, 2026

Respectfully submitted,

*/s/ Raphael Janove*
Raphael Janove
Max Ian Fiest
**JANOVE PLLC**
500 7th Ave., 8th Floor
New York, NY 10018
Tel: (646) 347-3940
Email: raphael@janove.law
Email : max@janove.law